**22-349-cv**
*Horn v. Medical Marijuana, Inc.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————

August Term, 2022

Submitted: February 22, 2023     Decided: August 21, 2023

Docket No. 22-349-cv

———————

DOUGLAS J. HORN,

*Plaintiff-Appellant,*

CINDY HARP-HORN,

*Plaintiff,*

— v. —

MEDICAL MARIJUANA, INC., DIXIE HOLDINGS, LLC, AKA DIXIE ELIXIRS, RED DICE HOLDINGS, LLC,

*Defendants-Appellees.*

DIXIE BOTANICALS,

*Defendant.*

———————

CERTIFIED COPY ISSUED ON 08/21/2023

1    Before:

2

3                        WALKER, LYNCH, and ROBINSON, *Circuit Judges*.

4                        ———————————————

5

6            Plaintiff-Appellant Douglas Horn appeals from an order of the United

7    States District Court for the Western District of New York (Jonathan W. Feldman,

8    *M.J.*) granting summary judgment to Defendants-Appellees on his claim under

9    the Racketeer Influenced and Corrupt Organizations Act ("RICO"). On appeal,

10   Appellant argues that the district court erroneously held that he lacks RICO

11   standing to sue for his lost earnings because those losses flowed from, or were

12   derivative of, an antecedent personal injury. We agree. RICO's civil-action

13   provision, 18 U.S.C. § 1964(c), authorizes a plaintiff to sue for injuries to

14   "business or property." While that language implies that a plaintiff cannot sue for

15   personal injuries, that negative implication does not bar a plaintiff from suing for

16   injuries to business or property simply because a personal injury was antecedent

17   to those injuries. We therefore **VACATE** the order granting summary judgment

18   to Appellees on Appellant's civil RICO claim, and **REMAND** to the district court

19   for further proceedings consistent with this Opinion.

20                        ———————————————

21

22                  Jeffrey M. Benjamin, The Linden Law Group, P.C., New York,

23                        NY, *for Plaintiff-Appellant*.

24

25                  Roy A. Mura, Scott D. Mancuso, Mura Law Group, PLLC,

26                        Buffalo, NY, *for Defendants-Appellees.*

27                        ———————————————

28

29   GERARD E. LYNCH, *Circuit Judge*:

30           Plaintiff-Appellant Douglas J. Horn lost his job as a commercial truck

31   driver, which he had held for more than ten years, after a random drug test

2

1    detected tetrahydrocannabinol ("THC") in his system. He maintains, however,

2    that he ingested THC unwittingly by consuming a cannabis-derived product that

3    was marketed as THC-free by Defendants-Appellees Medical Marijuana, Inc.,

4    Dixie Holdings, LLC, a/k/a Dixie Elixirs, and Red Dice Holdings, LLC

5    ("Appellees"). He then brought this lawsuit in the United States District Court for

6    the Western District of New York, asserting claims under the Racketeer

7    Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and

8    state law. Granting partial summary judgment to Appellees, the district court

9    (Jonathan W. Feldman, *M.J.*) held that Horn lacked RICO standing[1] because he

10   sued for losses – in particular, his loss of earnings – that were derivative of, or

11   flowed from, an antecedent personal injury.

12        We disagree. RICO's civil-action provision, 18 U.S.C. § 1964(c), authorizes a

13   plaintiff to sue for "injur[ies] in his business or property" that are proximately

14   caused by a violation of one of RICO's substantive provisions. While § 1964(c)

15   implicitly excludes recovery for personal injuries, nothing in § 1964(c)'s text, or

---

1    [1] Unlike Article III standing, RICO "standing" is not a jurisdictional requirement
2    but instead concerns a merits issue, *i.e.*, whether the RICO statute gave the
3    plaintiff a cause of action. *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 129-30 (2d Cir.
4    2003), *as amended* (Apr. 16, 2003) (Sotomayor, *J.*).

1    RICO's structure or history, supports an amorphous RICO standing rule that bars

2    plaintiffs from suing simply because their otherwise recoverable economic losses

3    happen to have been connected to or flowed from a non-recoverable personal

4    injury. Accordingly, we **VACATE** the district court's order granting summary

5    judgment to Appellees on Horn's RICO claim, and **REMAND** for further

6    proceedings consistent with this Opinion.

7                                    **BACKGROUND**

8    **I.      Factual Background**

9           The following facts are undisputed for purposes of this appeal.

10          In February 2012, Horn was in a car accident that caused injuries to his hip

11   and right shoulder. **[J.A. 31, Compl. ¶ 12]** He was prescribed medicine for those

12   injuries, but in the months following his accident, "he investigated natural

13   medicines as an alternative to his other prescriptions." J. App'x 31. In or around

14   September 2012, Horn discovered a magazine advertisement for Dixie X CBD

15   Dew Drops Tincture ("Dixie X"), a product that was jointly produced, marketed,

16   and sold by Appellees. **[J.A. 30-35, Compl. ¶¶ 6, 8, 10, 13-14, 22, 30]** The

17   advertisement read as follows:

18                          **CBD for Everyone!**

                                        4

1      Using a proprietary extraction process and a strain of
2      high-CBD hemp grown in a secret, foreign location,
3      Colorado's Dixie Elixirs and Edibles now offers a new
4      product line called Dixie X, which contains 0% THC and
5      up to 500 mg of CBD. This new CBD-rich medicine will
6      be available in several forms, including a tincture, a
7      topical and in capsules. Promoted as "a revolution in
8      medicinal hemp-powered wellness," the non-
9      psychoactive products will first roll out in Colorado
10      MMCs (medical marijuana centers), with plans to
11      quickly expand outside the medical-marijuana market.
12      "It has taken a tremendous amount of time, money and
13      effort, but finally patients here in Colorado – and
14      ultimately all individuals who are interested in utilizing
15      CBD for medicinal benefit – will be able to have access
16      to it," says Tripp Keber, Dixie's managing director. "We
17      are importing industrial hemp from outside the US
18      using an FDA import license – it's below federal
19      guidelines for THC, which is 0.3% – and we are taking
20      that hemp and extracting the CBD. We have
21      meticulously reviewed state and federal statutes, and
22      we do not believe that we're operating in conflict with
23      any federal law as it's related to the Dixie X (hemp-
24      derived) products."

25   *Id.* at 47. [***See also*** **J.A. 32-33, Compl. ¶¶ 13, 19**]

26       It was important to Horn that Dixie X was free of THC and compliant with

27   federal law. At the time, Horn and his wife, Cindy Harp-Horn, were working as a

28   team of commercial truck drivers for Enterprise Transportation Company. **[J.A.**

29   **50, Civil RICO Statement ¶ 4]** As a commercial truck driver, Horn was subject to

1   random drug testing by his employer, as required by the U.S. Department of

2   Transportation. **[J.A. 32-33, Compl. ¶¶ 16, 19]** Mindful of that restriction, Horn

3   and his wife sought to ensure the advertisement's accuracy by watching

4   YouTube videos, reviewing the FAQ page of Dixie X's website, and calling a

5   customer-service line – all of which corroborated the advertisement's

6   representation that Dixie X did not contain THC. **[J.A. 90-91]** Satisfied with that

7   investigation, Horn purchased Dixie X in October 2012. **[J.A. 32, Compl. ¶ 14]**

8       To Horn's dismay, after he consumed the product, he failed his employer's

9   random drug test and later a confirmatory drug test. **[J.A. 32, Compl. ¶¶ 16-17]**

10  Consequently, he lost his job, current and future wages, and insurance and

11  pension benefits. **[J.A. 33, Compl. ¶ 20]** At that time, he had twenty-nine years'

12  experience as a commercial truck driver, including more than ten years driving

13  for Enterprise Transportation Company. **[J.A. 32, ¶ 15]** At some point, Horn's

14  wife resigned from her job, believing it was unsafe to work as a commercial truck

15  driver without her husband. **[*Horn I*, 383 F. Supp. 3d at 122]**

16      Suspecting that Dixie X was to blame for his positive test, Horn purchased

17  some more and had an independent lab test the product. **[J.A. 32-33, Compl. ¶**

18  **18]** Those tests confirmed that Dixie X contained THC. **[Id.]**

1  **II.    Procedural History**

2        On August 6, 2015, Horn and Harp-Horn filed a nine-count complaint in

3  the United States District Court for the Western District of New York. Count 2

4  asserted a claim of RICO conspiracy under 18 U.S.C. §§ 1962(d), 1964(c). **[J.A. 37-**

5  **39]** Underlying that claim were predicate acts of mail and wire fraud, 18 U.S.C.

6  §§ 1341, 1343, and of engaging in transactions with money derived from specified

7  unlawful activities, 18 U.S.C. § 1957. **[J.A. 39, Compl. ¶ 46]** The other eight counts

8  were New York state law claims for deceptive business practices/false

9  advertising, fraudulent inducement, products liability, breach of contract, breach

10 of express warranty, unjust enrichment, negligence, and negligent infliction of

11 emotional harm. **[J.A. 36-43]**

12       The district court dismissed Harp-Horn's claims and whittled Horn's

13 claims to two: (1) the civil RICO claim, as predicated on mail and wire fraud; and

14 (2) the state-law fraudulent inducement claim. *See Horn v. Med. Marijuana, Inc.*

15 *(Horn I)*, 383 F. Supp. 3d 114, 135 (W.D.N.Y. 2019); *Horn v. Med. Marijuana, Inc.*

16 *(Horn II)*, No. 15-cv-0701, 2019 WL 11287650, at *3 n.3, *5 (W.D.N.Y. Nov. 22,

17 2019).

1    With a trial date approaching, on July 22, 2021, Dixie Holdings moved to

2    preclude the trial testimony of Horn's damages expert, arguing that his lost

3    earnings are not recoverable under RICO or the remaining state-law claim. **[D.**

4    **Ct. Dkt. No. 194;** *see also* **J.A. 24]** The district court construed that motion as

5    dispositive, agreed with Dixie Holdings as to the RICO claim but not the state-

6    law claim, and accordingly granted partial summary judgment to Appellees on

7    the RICO claim. **[D. Ct. Dkt. No. 202;** *see also* **J.A. 35]** *Horn v. Med. Marijuana, Inc.*

8    *(Horn III)*, No. 15-cv-0701, 2021 WL 4173195 (W.D.N.Y. Sept. 14, 2021). Following

9    out-of-circuit precedent, the district court reasoned that Horn's lost earnings

10   "flow[] from, and [are] derivative of, a personal injury" – that is, an unconsented

11   bodily invasion by THC – and therefore "do not constitute an injury 'to business

12   or property' that is recoverable in a civil RICO action" brought under 18 U.S.C.

13   § 1964(c). *Id.* at *5. On January 24, 2021, the district court entered final judgment

14   on Horn's civil RICO claim, thereby certifying this appeal, pursuant to Federal

15   Rule of Civil Procedure 54(b). *Horn v. Med. Marijuana, Inc. (Horn IV)*, No. 15-cv-

16   0701, 2022 WL 206235, at *4 (W.D.N.Y. Jan. 24, 2022).

8

1                                    **DISCUSSION**

2        Horn challenges the district court's decision to grant summary judgment to

3    Appellees on his RICO claim. "We review de novo a district court's decision to

4    grant summary judgment, construing the evidence in the light most favorable to

5    the party against whom summary judgment was granted and drawing all

6    reasonable inferences in that party's favor." *Covington Specialty Ins. Co. v. Indian*

7    *Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023), quoting *Bey v. City of*

8    *New York*, 999 F.3d 157, 164 (2d Cir. 2021). We agree with Horn that the district

9    court erred in holding that he cannot sue for his loss of earnings.[2] RICO's civil-

10   action provision, 18 U.S.C. § 1964(c), does not bar a plaintiff from suing for

---

1    [2] But we reach that conclusion under a different rationale than the one argued by

2    Horn. Horn disputes that his lost earnings flow from a personal injury, arguing

3    that any personal injury he suffered through his unwitting ingestion of THC was

4    only incidental to his lost earnings. **[Blue Br. 10-14]** But a logically antecedent

5    legal question is whether § 1964(c) bars a plaintiff from suing for injuries to

6    business or property simply because they flow from, or are derivative of, a

7    personal injury. It is that question we answer. How to apply a statutory provision

8    like § 1964(c) "fairly includes the question of what that statute says," and we are

9    not compelled to "accept an interpretation of a statute simply because it is agreed

10   to by the parties." *Rumsfeld v. FAIR*, 547 U.S. 47, 56 (2006); *cf. United States v.*

11   *Grubbs*, 547 U.S. 90, 95 n.1 (2006) ("It makes little sense to address what the

12   Fourth Amendment requires of anticipatory search warrants if it does not allow

13   them at all."); *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 75 n.13 (1996) (deciding a

14   question that is logically antecedent to the issue presented).

1    injuries to business or property simply because they flow from, or are derivative

2    of, an antecedent personal injury. In reaching that conclusion, we outline the

3    plain and ordinary meaning of injury to "business" as used in § 1964(c) and then

4    explain why RICO does not contain the limitation that the district court applied

5    in this case.

6    **I.      The Plain and Ordinary Meaning of "Injured in His Business"**

7          "[W]e start . . . with the text of the statute," *Van Buren v. United States*, 141

8    S. Ct. 1648, 1654 (2021), "seek[ing] to discern and apply the ordinary meaning of

9    its terms at the time of their adoption," *BP P.L.C. v. Mayor & City Council of*

10   *Baltimore*, 141 S. Ct. 1532, 1537 (2021). Section 1964(c) authorizes "[a]ny person

11   injured in his business or property by reason of a violation of section 1962 of this

12   chapter [to] sue therefor in any appropriate United States district court . . . ." 18

13   U.S.C. § 1964(c). Because "Congress modeled § 1964(c) on the civil-action

14   provision of the federal antitrust laws, § 4 of the Clayton Act," *Holmes v. Sec. Inv.*

15   *Prot. Corp.*, 503 U.S. 258, 267 (1992), cases concerning antitrust standing inform

16   our interpretation, but only to the extent relevant in this setting and consistent

17   with the Supreme Court's instruction not to import into RICO barriers to

18   standing that are "appropriate in a purely antitrust context" and not adapted to

10

1    the purposes of RICO, *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985)

2    (rejecting this Circuit's old "racketeering injury" requirement).

3          As alluded to above, the key text here is the phrase "business or property."

4    By using the disjunctive "or" to separate "business" from "property," Congress

5    made clear that "'business' was not intended to modify 'property,' nor was

6    'property' intended to modify 'business.'" *Reiter v. Sonotone Corp.*, 442 U.S. 330,

7    339 (1979) (interpreting § 4 of the Clayton Act). We therefore give each of those

8    terms its "independent and ordinary significance." *Id.* at 338-39.

9          At the time of § 1964(c)'s codification, the term "business" did not

10    "embrace" a single "legal meaning." Black's Law Dictionary 248 (Rev. 4th ed.

11    1968). Instead, the term embraced concepts like "employment, occupation, or

12    profession engaged in for gain or livelihood," and "commercial or industrial

13    establishment or enterprise." *Id.*; *see also Flint v. Stone Tracy Co.*, 220 U.S. 107, 171

14    (1911) (explaining that "[b]usiness" as used in the Tariff Act of 1909 "is a very

15    comprehensive term and embraces everything about which a person can be

16    employed"). Non-legal dictionaries of the time reflect similar understandings. *See*

17    Webster's Third New International Dictionary 302 (1971) (defining "business" as

18    a "commercial or mercantile activity customarily engaged in as a means of

11

1    livelihood and typically involving some independence of judgment and power of

2    decision," and as "a commercial or industrial enterprise").

3        Because the term "business" encompasses "employment," Horn has

4    suffered an injury "in his business," as contemplated by the RICO statute. His

5    suit is premised on his long-time employer terminating his employment as a

6    commercial truck driver (for which he had twenty-nine years' total experience)

7    because he tested positive for THC. That termination cost him current and future

8    wages and his insurance and pension benefits – all of which were tied to his

9    employment. **[J.A. 33, Compl. ¶ 20]**

10       That is sufficient to state a "business" injury under the RICO statute. "A

11   person does not have to wear a suit and tie to be engaged in 'business.'" *Diaz v.*

12   *Gates*, 420 F.3d 897, 905 (9th Cir. 2005) (en banc) (Kleinfeld, *J.*, concurring). Nor

13   does a person need to own a sole proprietorship or be an independent contractor.

14   *Id.* at 905-06. "The distinction between 'business' and employment is so tenuous

15   and uncertain that it is hard to see why we should attribute to Congress a

16   purpose of making it, especially since they did not make it expressly." *Id.* at 906.

17   And, as the Supreme Court has instructed, "RICO is to be read broadly." *Sedima*,

18   473 U.S. at 497. "This is the lesson not only of Congress' self-consciously

12

1    expansive language and overall approach, but also of its express admonition that

2    RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Id.* at 497-

3    98, citing *United States v. Turkette*, 452 U.S. 576, 586-87 (1981), and quoting Pub. L.

4    91-452, § 904(a), 84 Stat. 947. There is, in short, no reason to suppose that

5    Congress sought to protect enterprises to the exclusion of ordinary employees, or

6    to protect certain means of livelihood but not others. Accordingly, when Horn

7    lost his job, he suffered an injury to his business within the plain meaning of

8    § 1964(c).[3]

9    **II.      The Antecedent-Personal-Injury Bar**

10   Rather than apply the plain and ordinary meaning of the phrase "business

11   or property," the district court adopted an atextual restrictive interpretation of

12   the statute, adopted by the en banc Sixth Circuit over the dissent of five judges,

13   that denies RICO standing to any plaintiff whose pecuniary loss "flows from, or

14   is derivative of," an antecedent personal injury, even if the loss constitutes an

15   injury to "business or property" within the plain and ordinary meaning of that

16   phrase. *Horn III*, 2021 WL 4173195, at *3**,** citing *Jackson v. Sedgwick Claims Mgmt.*

---

1    [3] The term "property" presents a less straightforward inquiry. In light of our
2    holding that Horn suffered an injury to his business, we have no need to decide
3    whether Horn suffered an injury to property when he lost his job.

1    *Servs., Inc.*, 731 F.3d 556, 565-66 (6th Cir. 2013) (en banc) ("[B]oth personal injuries

2    and pecuniary losses flowing from those personal injuries fail to confer relief

3    under § 1964(c).")[4] In doing so, the district court deviated from the en banc Ninth

4    Circuit, which had rejected a similar approach as "flawed" in *Diaz*, 420 F.3d at

5    901-02.[5]

---

1   [4] While Judge Clay concurred in the judgment, he did so on alternative grounds,
2   rejecting the majority's standard as "imprecise and atextual." *Jackson*, 731 F.3d at
3   570 (Clay, *J.*, concurring in the judgment).

1   [5] The district court also drew support from the Seventh and Eleventh Circuits. *See*
2   *Horn III*, 2021 WL 4173195, at *3. Those circuits ask whether the plaintiff's
3   claimed pecuniary losses are more properly understood as part of a personal
4   injury claim, and in doing so assess whether those losses are derivative of, flow
5   from, or are intertwined with an antecedent personal injury. *See Evans*, 434 F.3d
6   at 928-30 & n.26; *Doe*, 958 F.2d at 770; *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir.
7   1988). While neither circuit has placed decisive weight on the presence of an
8   antecedent personal injury, *see Grogan*, 835 F.2d 848 (leaving open whether losses
9   "resulting from murder" are recoverable under RICO); *Evans*, 434 F.3d at 928
10  (leaving open whether a victim of false imprisonment could, in a future case,
11  recover "promised or contracted for wages" or losses to a "lawful business
12  enterprise or activity"), we think that those circuits, for substantially the same
13  reasons as the Sixth Circuit, get the inquiry backwards. The question is not
14  whether a plaintiff's claimed pecuniary losses are more properly understood as
15  part of a personal injury claim, or whether the injury is derivative of, flows from,
16  or intertwined with a personal injury. Instead, the question is whether the
17  plaintiff's pecuniary losses constitute an injury to "business or property." 18
18  U.S.C. § 1964(c). That is all the plaintiff must show.

19  We acknowledge that in one summary order, we affirmed a district court's order
20  dismissing a plaintiff's civil RICO claim, *see Gause v. Philip Morris Inc.*, 29 F.
21  App'x 761 (2d Cir. 2002), which relied in part on the Seventh Circuit's approach,

1    We understand the justification of that rule, which we call the antecedent-

2    personal-injury bar, to be as follows: (1) by expressly authorizing suit for injuries

3    to "business or property," § 1964(c) implicitly excludes suit for other types of

4    injuries – most notably, "personal injuries"; and (2) for that implied limitation to

5    retain significance, Congress must also have implicitly intended to exclude

6    injuries to business or property that flow from an antecedent personal injury, as

7    most personal injuries lead to some pecuniary losses. *See Jackson*, 731 F.3d at 563-

8    66. Otherwise, the district court explained, a plaintiff could "easily recast

9    damages for personal injury as a financial loss of 'property' in order to invoke

10   civil RICO." *Horn III*, 2021 WL 4173195, at *3.

11   We are not persuaded, and thus reject the antecedent-personal-injury bar.

12   *Cf. Diaz*, 420 F.3d at 901-02. As an initial matter, we agree that § 1964(c) implicitly

13   excludes recovery for personal injuries. *See RJR Nabisco, Inc. v. Eur. Cmty.*, 579

14   U.S. 325, 350 (2016); *see also Reiter*, 442 U.S. at 339 (interpreting § 4 of the Clayton

---

1    *see Gause v. Philip Morris*, No. 99-cv-6226, 2000 WL 34016343, at *4 (E.D.N.Y. Aug.
2    8, 2000). While we endorsed "the reasons stated" by the district court, all we
3    actually said, which we do not question here, was that "[p]ersonal injuries of
4    smokers are not injuries to 'business or property' within the meaning of [RICO]."
5    *Gause*, 29 F. App'x 761. In any event, summary orders do not have the force of
6    precedent, *see* 2d Cir. Local R. 32.1.1(a), even if we may sometimes consider them
7    persuasive, *see United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010).

1     Act). In other words, "a person physically injured in a fire whose origin was

2     arson is not given a right to recover for his personal injuries" under § 1964(c);

3     rather, he may recover for things like "damage to his business or his building"

4     caused by the fire. *Bankers Tr. Co. v. Rhoades*, 741 F.2d 511, 515 (2d Cir. 1984),

5     *vacated on other grounds*, 473 U.S. 922 (1985). At its core, civil RICO was "designed

6     to remedy *economic* injury." *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,

7     483 U.S. 143, 151 (1987) (emphasis added); *accord Bascuñán v. Elsaca*, 874 F.3d 806,

8     817 & n.45 (2d Cir. 2017).

9          But the negative implication that RICO excludes recovery for personal

10    injury does not mean that a plaintiff cannot sue for injuries to business or

11    property simply because they flow from, or are derivative of, a personal injury.

12    "The force of any negative implication . . . depends on context," *N.L.R.B. v. SW*

13    *Gen., Inc.*, 580 U.S. 288, 302 (2017), quoting *Marx v. Gen. Revenue Corp.*, 568 U.S.

14    371, 381 (2013), and nothing in RICO's text or structure "provides for ignoring

15    damage to a[] . . . legal entitlement because it arose following a personal injury,"

16    *Jackson*, 731 F.3d at 579 (Moore, *J.*, dissenting). Thus, "[w]hile it seems undisputed

17    that RICO liability will not attach where the injuries alleged are personal ones,

18    there is no textual reason to extend that bar" to an injury to business or property

16

1    "for which a personal injury was a necessary precursor." *Id*. at 570-71 (Clay, *J.*,

2    concurring in the judgment) (internal citations omitted); *see also Diaz*, 420 F.3d at

3    903 (Kleinfeld, *J.*, concurring) ("The RICO statute tells us what kinds of injuries

4    give rise to RICO claims.").

5        First, we find it significant that § 1964(c)'s "by reason of" requirement

6    "incorporates a proximate cause standard." *Diaz*, 420 F.3d at 901, citing *Holmes*,

7    503 U.S. at 265-68. Proximate cause considers, among other things, the

8    permissible degree of attenuation between the claimed harm and the predicate

9    act, and requires "some direct relation between the injury asserted and the

10   injurious conduct alleged." *Holmes*, 503 U.S. at 268. Still, proximate cause "is

11   generous enough to include the unintended, though foreseeable, consequences of

12   RICO predicate acts," including, in some instances, harms that flow from, or are

13   derivative of, each other. *Diaz*, 420 F.3d at 901, citing *Palsgraf v. Long Island R.R.*

14   *Co.*, 248 N.Y. 339, 342-47 (1928) (Cardozo, *C.J.*).[6]

15       Thus, by enacting a proximate-cause limitation on RICO standing,

16   Congress made a judgment concerning the permissible degree of attenuation

---

1    [6] Because the district court addressed only whether Horn suffered a redressable
2    injury to business or property, we take no position on whether Horn satisfies
3    § 1964(c)'s other requirements, including proximate cause.

17

1    between a predicate act and a redressable RICO injury. The antecedent-personal-

2    injury bar coopts that judgment, imposing a more restrictive attenuation

3    principle that bars suit whenever there is a necessary antecedent personal injury,

4    even where that injury and the resulting injuries to business or property were

5    intended or foreseeable (*i.e.*, proximate). As a general matter, when Congress

6    uses "explicit language in one provision," that "cautions against inferring the

7    same" or a similar "limitation in another provision." *State Farm Fire & Cas. Co. v.*

8    *U.S. ex rel. Rigsby*, 580 U.S. 26, 34 (2016) (internal quotation marks omitted)

9    (declining to hold that the False Claims Act "mandate[s] dismissal" for "violating

10   [its] seal requirement," in part because other provisions of the Act "require, in

11   express terms, the dismissal of a relator's action" for other reasons); *accord Ysleta*

12   *Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1941 (2022). Reading the antecedent-

13   personal-injury bar into the phrase "business or property" violates that principle,

14   based on nothing more than an implicit limitation in the text of § 1964(c).

15         Second, the phrase "business or property" focuses on the *nature* of the

16   harm, not the *source* of the harm, as demonstrated by the dictionary definitions of

17   those terms. Section 1964(c) addresses the source of the harm elsewhere,

18   requiring that civil suits be premised on a "violation of section 1962." And that

18

1    source restriction cuts against reading into § 1964(c) yet another source restriction

2    that would exclude injuries to business or property that flow from, or are

3    derivative of, a personal injury. Section 1962(c) prohibits "any person employed

4    by or associated with any enterprise" from conducting or participating in the

5    "affairs" of the "enterprise[]" through a "pattern of racketeering activity." The

6    term "racketeering activity" includes "murder" and "kidnapping," § 1961(1)(A),

7    and neither of those acts, themselves, amount to "injury to business or property,"

8    *Diaz*, 420 F.3d at 904 (Kleinfeld, *J.*, concurring). Both directly result in "personal

9    injury to a human being." *Id.* But both acts may nonetheless "*give rise* to 'injury to

10   business or property' under section 1964." *Id.* at 905 (emphasis added). Thus,

11   because "personal injuries, including murder and kidnapping, are expressly

12   listed in section 1961 as 'racketeering' conduct that can give rise to claims under

13   the statute," § 1964(c) cannot be read to deny RICO standing for injuries to

14   business or property simply because the plaintiff suffered an antecedent personal

15   injury. *Id.* at 904.

16          Third, and relatedly, the antecedent-personal-injury bar precludes various

17   types of civil suits that are at the core of RICO's substantive prohibitions. Murder

18   and kidnapping are obvious examples. So too is the broader offense of

1    "extortion," § 1961(1), which at the time of RICO's adoption generically meant to

2    "obtain[] something of value from another with his consent induced by the

3    wrongful use of force, fear, or threats," *United States v. Nardello*, 393 U.S. 286, 290

4    (1969); *accord Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409-10 (2003).

5    Similarly, loan sharking – *i.e.*, the "collection of unlawful debt." § 1962(c); *see also*

6    § 1961(6) (defining unlawful debt). Loan sharking was a principal evil with which

7    Congress was concerned when it enacted RICO, *see* S. Rep. No. 91-617, at 158-59

8    (1969), undoubtedly due to the loan shark's frequent means of collecting debt:

9    violence. *See* 18 U.S.C. §§ 891-894 (criminalizing extortionate extensions of credit

10   and collection of debt); 18 U.S.C. § 1961(1)(B) (defining those crimes as

11   racketeering activity). Yet, the antecedent-personal-injury bar would preclude

12   recovery for injuries to business or property that flow from, or are derivative of,

13   personal injuries that inevitably result from the murder of a business owner who

14   resists paying a demand for protection money; the kidnapping of a bar owner

15   who refuses to sell his property to the mafia; the extortionate battery of a car-

16   wash owner who refuses to launder money; and the shooting of an individual

17   who fails to pay an unlawful debt.

18        While RICO's scope has expanded beyond its originally anticipated

20

1    applications, those are core applications of RICO, as unambiguously reflected by

2    its text and structure. But under the antecedent-personal-injury bar, § 1964(c)'s

3    *implicit* exclusion of personal injuries would trump those core applications of

4    RICO even as to expressly covered injuries to business or property. The negative-

5    implication canon "must be applied with great caution, since its application

6    depends so much on context," Antonin Scalia & Bryan A. Garner, Reading Law:

7    The Interpretation of Legal Texts 107 (2012), and the context underlying § 1964(c)

8    is, if nothing else, Congress's clear goal to thwart ruthless thugs whose violence

9    exerts influence over legitimate business.[7] The antecedent-personal-injury bar

10   would ignore that context by precluding recovery, not only where recovery is

---

1    [7] RICO's legislative history reflects that understanding. RICO was passed as part
2    of Title IX to the Organized Crime Control Act, whose purpose was to eliminate
3    "the infiltration of organized crime and racketeering into legitimate organizations
4    operating in interstate commerce." *See* S. Rep. No. 91-617, at 76. To some,
5    § 1964(c) was central to attaining that end. *See* House Hearings on S. 30 and
6    Related Proposals, Before Subcomm. No. 5 of the House Comm. on the Judiciary,
7    91st Cong. 520 (1970) (statement of Hon. Sam Steiger) ("Title IX's civil provisions
8    promise to be far more effective than any existing authority as a means of
9    protecting legitimate businessmen from the ruthless and oppressive methods
10   used by organized crime in its business dealings, and as a means of guarding the
11   American principle of free competition in the market place."). It would thus be
12   anomalous to deny civil plaintiffs access to RICO's remedies simply because their
13   business or property losses flow from violent and ruthless criminal activity
14   inflicted upon their persons.

1    sought for pain and suffering or payment of medical bills resulting from personal

2    injuries, but also for injuries to a victim's business or property whenever a

3    personal injury is a necessary precursor.

4         Why, then, would Congress focus the nature of the harm specifically on

5    "business or property," thereby implicitly excluding recovery for personal

6    injury? The legislative history does not offer an answer. *See* Patrick Wackerly,

7    *Personal Versus Property Harm and Civil RICO Standing*, 73 U. Chi. L. Rev. 1513,

8    1522-25 (2006) (examining records from the House of Representatives and the

9    Senate, and concluding that "the legislative history of civil RICO from both

10    chambers is largely silent regarding the purpose of § 1964(c)"). It could be that

11    Congress simply adopted what it considered to be an effective civil-action

12    provision in § 4 of the Clayton Act. *See Holmes*, 503 U.S. at 267. Alternatively,

13    Congress may have "chose[n] to address [harm to business or property] in order

14    to focus upon the harm racketeering does to interstate commerce." *Diaz*, 420 F.3d

15    at 906 (Kleinfeld, *J.*, concurring).

16         That the rationale for excluding personal injury damages from liability

17    under civil RICO may be mysterious does not matter in light of § 1964(c)'s text,

18    which clearly limits liability to injuries to "business or property." There is thus no

1    basis for a civil RICO claim for physical or emotional suffering that results from

2    an injury to a victim's person. But, conversely, in the absence of any apparent

3    explanation, there is no basis to extend that implicit exclusion to further exclude

4    recovery for the types of injury that Congress expressly provided. After all,

5    § 1964(c) contains no language prohibiting "personal injury actions," which could

6    be construed to preclude recovery of any damages that might typically be sought

7    in such an action. Rather, the exclusion of liability for personal injury is a

8    consequence of language that *authorizes* suit for injuries to "business or

9    property," which is reasonably read to exclude claims for such injuries as pain

10   and suffering or loss of consortium, which cannot be characterized as injuries to

11   "business or property." Congress expressly authorized plaintiffs to sue for

12   injuries to "business or property," and business and property are no less injured

13   simply because there is an antecedent personal injury.

14          Fourth, the desire to deny recovery where there is an antecedent personal

15   injury is partly based on a concern that the Supreme Court has instructed courts

16   to ignore: a concern with "increasing the number of RICO claims" if RICO

17   standing were recognized. *Jackson*, 731 F.3d at 571 (Clay, *J.*, concurring in the

18   judgment). That policy "consequence[], assuming [it is] undesirable, cannot blind

23

1  us to the statutory language." *Diaz*, 420 F.3d at 901. To the contrary, the Supreme

2  Court has expressly cautioned lower courts not to use that concern to impose

3  "additional, amorphous" RICO standing requirements even when a court might

4  reasonably anticipate that civil plaintiffs will "misuse" RICO. *Sedima*, 473 U.S. at

5  481, 495. In *Sedima*, the Supreme Court reversed this Circuit's rule that a plaintiff

6  must show a "racketeering injury" to have RICO standing. *Id.* at 495, 499-500. The

7  Supreme Court explained that "RICO was an aggressive initiative to supplement

8  old remedies and develop new methods for fighting crime," and that Congress

9  enacted § 1964(c) to avoid the imposition of "inappropriate and unnecessary

10  obstacles in the way of . . . a private litigant" suing under RICO. *Id.* at 498

11  (internal quotation marks omitted; ellipses in original). While an expansive view

12  of RICO might allow private litigants to use RICO in ways not previously

13  anticipated (such as a "tool for everyday fraud cases," even against "respected

14  and legitimate enterprises"), that "defect – if defect it is – is inherent in the statute

15  as written." *Id.* at 499 (internal quotation marks omitted). "[I]ts correction must

16  lie with Congress," not the judiciary. *Id.*

17  Not only are we bound by the Supreme Court's instruction in *Sedima*, but

18  that instruction seems especially appropriate here. For one, there is no "misuse"

24

1    of RICO when a victim sues a criminal enterprise for violence inflicted upon him

2    that results in injury in his business or property, and thus no reason to be

3    dismayed by the number of claims that might be filed alleging such injury. Such

4    suits, as noted, are core applications of RICO. In this particular case, moreover,

5    Horn does not seek damages for any personal injury, and indeed disclaims

6    having suffered any, beyond what could be construed as an unconsented bodily

7    invasion based on his ingestion of a fraudulently misrepresented product. His

8    only claimed injury is the loss of his employment due to the detection of an

9    illegal substance in his body – the very substance that defendants had

10   represented was not present in the product it sold him.

11          Moreover, the antecedent-personal-injury bar produces a different policy

12   concern, as it would generate arbitrary and inconsistent outcomes. For example,

13   while the antecedent-personal-injury bar would allow a plaintiff to sue "for the

14   fraudulent devaluation of welfare benefits, which do not arise following a

15   personal injury," it would bar a plaintiff from suing "for the fraudulent

16   devaluation of worker's compensation benefits, solely because the latter do."

17   *Jackson*, 731 F.3d at 580 (Moore, *J.*, dissenting). Likewise, that rule leads to "the

18   anomalous result that one could be liable under RICO for destroying a business if

25

1    one aimed a bomb at it, but not . . . if one aimed at the business owner" and

2    successfully struck him, thus preventing him from conducting the business. *Diaz*,

3    420 F.3d at 901-02. It is not appropriate for a federal court to speculate which of

4    two alternative policy consequences (*e.g.*, more unanticipated claims or

5    inconsistent outcomes) would be a greater concern to Congress.

6         Finally, we should note that, under our approach, the phrase "business or

7    property" is not boundless but instead "retains restrictive significance." *Reiter*,

8    442 U.S. at 339. Thus, contrary to the district court's atextual concern, a plaintiff

9    cannot "easily recast damages for personal injury as a financial loss of 'property'

10   in order to invoke civil RICO." *Horn III*, 2021 WL 4173195, at *3. The plaintiff

11   must, instead, suffer an injury to business or property, and not all injuries can be

12   recast to satisfy the definitions of those terms. Quite obviously, a person cannot

13   sue for non-pecuniary injuries like "loss of consortium, loss of guidance, mental

14   anguish, and pain and suffering," *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir.

15   1988), even though those injuries can be (imprecisely) quantified. Moreover, even

16   if a plaintiff has suffered an injury to business or property, the plaintiff must

17   satisfy RICO's proximate-cause standard, which requires "some direct relation

18   between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S.

26

1    at 268. Thus, it is simply wrong to suggest that the antecedent-personal-injury bar

2    is necessary to ensure "genuine limitations" in § 1964(c), *Jackson*, 731 F.3d at 563,

3    or to give restrictive significance to Congress's implicit intent "'to exclude some

4    class of injuries by the phrase "business or property"' when it enacted RICO," *id.*

5    at 564, quoting *Reiter*, 442 U.S. at 339.

6          Accordingly, § 1964(c) does not bar a plaintiff from suing for injuries to

7    business or property simply because those injuries flow from, or are derivative

8    of, an antecedent personal injury. For that reason, the district court erred in

9    granting summary judgment to Appellees on Horn's RICO claim.

10    **CONCLUSION**

11          For the reasons set forth above, we **VACATE** the district court's order

12    granting Appellees' motion for summary judgment, and **REMAND** for further

13    proceedings consistent with this Opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

27